IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GOLDEN LIVING CENTER – GRAND ISLAND LAKEVIEW,<br><br>       Plaintiff/Petitioner,<br><br>v.<br><br>KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services,<br><br>       Defendant/Respondent. | Case No. 8:11-cv-119<br><br>**COMPLAINT FOR REVIEW OF FINAL AGENCY ACTION AND DECLARATORY RELIEF** |

## I. INTRODUCTION

1. Petitioner is a Medicare/Medicaid certified nursing facility located in Grand Island, Nebraska. (To avoid confusion, Petitioner uses the terminology employed in the administrative proceedings below, rather than "Plaintiff.") This case presents the purely legal question whether the Defendant Secretary of Health and Human Services may interpret and apply her regulations to deny Petitioner administrative review of a completely unwarranted "finding" that Petitioner permitted "sexual abuse" of one or more of its residents.

2. The background to this action is straightforward. In April, 2010, the Nebraska Department of Health and Human Services, acting as agent for the Defendant Secretary, charged Petitioner with "sexual abuse" of its residents because two of Petitioner's residents who suffer from Alzheimer's Disease had developed a relationship in which they occasionally engaged in affectionate touching such as holding hands and

hugging.  According to the State, persons suffering from dementia cannot consent to any physical contact that has any "sexual" connotation, and so the State found that the fact that these two persons occasionally held hands and hugged ipso facto represents a violation *by Petitioner* of the Secretary's regulations that prohibit nursing facilities from "sexually abusing" residents.

3.   Based solely upon this supposed violation, the Secretary imposed a sanction on Petitioner.  Petitioner considered this result to be absurd, and so filed an administrative appeal to the Secretary's "Departmental Appeals Board" that the Secretary concedes met all of her applicable procedural requirements.  But the Board's ALJ dismissed the appeal, and the Board itself upheld that dismissal – while at the same time leaving the underlying finding of "sexual abuse" on the public record (and available for collateral regulatory and other purposes) – on the ground that the Secretary's regulations allow her to vitiate a properly filed appeal simply by withdrawing her sanction, but *not* the underlying finding of noncompliance.  A copy of the Board's Decision is attached hereto.

4.   Petitioner seeks a declaration by this Court that this result – and the underlying interpretation and application of the Secretary's appeal regulations – violates the administrative review provisions of the Social Security Act, as well as the Administrative Procedure Act and the due process requirements of the Constitution, as interpreted and applied by numerous decisions by the Supreme Court.  In the alternative, should the Court determine that Petitioner has exhausted all available administrative review procedures, Petitioner requests that this Court address the merits of the underlying allegation of "sexual abuse."

## II. JURISDICTION AND VENUE

5.  This is a civil action which involves the Medicare provisions of the Social Security Act, 42 U.S.C. §§ 1395 et seq.; the Medicaid provisions of that Act, 42 U.S.C. §§ 1396 et seq.; the Administrative Procedure Act, 5 U.S.C. §§ 551 et. seq.; and the Constitution of the United States. The Board's Decision represents final administrative action by the Defendant Secretary, and this Court has jurisdiction to review such a final action under 42 U.S.C. § 405(g).

6.  This Complaint is timely under 42 C.F.R. § 498.95(a).

7.  Venue to review the Board's Final Decision is proper in this District under 42 U.S.C. § 405(g), because Petitioner's facility is located in this District.

## III. PARTIES

8.  Petitioner is a nursing facility located in Grand Island, Nebraska that is owned and operated by a wholly-owned subsidiary of Golden Ventures, a privately held limited liability company that owns and operates nursing facilities, and provides other health care services, throughout the United States. The Secretary's regulations specify that "the provider" – the "certified nursing facility" itself, and not its owner or operator – is the appropriate party to initiate administrative and judicial appeals of Secretarial enforcement actions. 42 C.F.R. §§ 498.2; 498.5(b) and (c); 498.90.

9.  Defendant Kathleen Sebelius ("the Secretary") is Secretary of the United States Department of Health and Human Services, which is responsible for administration of the Medicare Program, and for federal responsibilities under the Medicaid Program. Defendant Sebelius is sued in her official capacity.

## IV. STATUTORY AND REGULATORY BACKGROUND

### The Medicare and Medicaid "Survey" And Enforcement Process

10. The Medicare Program is a federal health insurance program for the aged and disabled under which nursing facilities are reimbursed by the federal government for the treatment and care they provide to Medicare Program beneficiaries. The Medicaid Program is a cooperative state-federal program which provides medical assistance, including nursing facility benefits, to needy persons.

11. Nursing facilities such as Petitioner that "participate" in the Medicare or Medicaid Programs must be "certified" for such participation pursuant to federal regulations set forth in 42 C.F.R. §§ 483.1 et. seq. (Medicare) and 42 C.F.R. §§ 442.1 et seq. (Medicaid). These requirements, commonly known as the "Long Term Care Requirements of Participation" ("ROPs"), set forth numerous physical plant, staffing, resident rights, clinical and operational requirements.

12. Under 42 U.S.C. § 1395aa, the Secretary is authorized to enter into agreements with state agencies (known as "state survey agencies" or "SSAs") to inspect (or "survey") nursing facilities that participate in the Medicare and/or Medicaid Programs to determine compliance with federal law, including the ROPs. The Nebraska Department of Health and Human Services has entered into a contract with the Secretary under which it has been designated as Nebraska's SSA.

13. The SSA must survey each such certified nursing facility on average about once per year (and also in response to complaints, changes of ownership and certain other events). Surveyors review compliance with hundreds of regulatory requirements, including

the ROPs, as "explained" by Secretary in a myriad of informal manuals, "interpretive guidelines," directives to SSAs, and the like.  In addition, many of the ROPs are broadly worded, and evaluation of compliance requires the exercise of "surveyor judgment."

14.     Surveyors may cite as a "deficiency" any instance in which they determine – by observation, interview, record review, or any other means – that a certified facility has not maintained "substantial compliance" with a regulatory requirement.  Because the survey process is so comprehensive, nearly all of the 17,000 certified nursing facilities are cited for "deficiencies" at some point, and the Secretary consistently reports that about 90% of facilities are cited for deficiencies annually.

15.     42 U.S.C. § 1395i-3(h) then sets forth an "enforcement" scheme that assigns sanctions to various levels of noncompliance, which the Secretary classifies according to four levels of "severity" and three of "scope," as measured by "potential" or "actual" harm to residents.  The statute authorizes the Secretary to impose sanctions ranging from "termination" from the Medicare and Medicaid Programs in the most serious cases (or for noncompliance that persists uncorrected for more than six consecutive months), to civil monetary penalties, denials of payment for new admission, directed plans of correction, and others, for less serious noncompliance.  The details of the enforcement process are set forth in regulations at 42 C.F.R. Part 488.

16.     The Social Security Act, and the Secretary's regulations, provide that when the Secretary makes a finding of noncompliance, or imposes a sanction, a nursing facility is entitled to review by an administrative law judge, and, thereafter, to judicial review.

5

17. For more than 35 years, the Secretary consistently has taken the position, and the Supreme Court consistently has agreed, that 42 U.S.C. §§ 405(b) and (g) (and 1395i-3(h)(2)(B)(ii), which governs review of civil monetary penalties) provide that any challenge to any Secretarial determination under the Social Security Act -- including enforcement determinations -- must be "channeled" through the Secretary's administrative review process (a sort of combination of the principles of exhaustion of administrative remedies and jurisdictional ripeness) as a prerequisite to judicial review.

18. The Secretary's regulations at 42 C.F.R. §§ 498.1 et seq. set forth the logistics of her administrative appeal process. In pertinent part, the regulations provide that any "affected party" may appeal any "initial determination" by the Secretary to her "Departmental Appeals Board."

19. According to 42 C.F.R. § 489.3(b)(13), appealable "initial determinations" include "a finding of noncompliance that results in the imposition of" any regulatory sanction against a nursing facility.

20. The regulation provides for review of such "initial determinations" by an administrative law judge, and then by the Board's "Appellate Division," a panel (not consisting of ALJs) appointed by the Secretary.

21. The Board's Decision represents the final action by the Secretary. Appeals of Board Decisions in cases where the Secretary has imposed a civil monetary penalty are directly to the Court of Appeals, 42 U.S.C. § 1395i-3 (h)(2)(B)(ii); appeals of all other Board Decisions are to the District Court under 42 U.S.C. § 405(g).

## V. FACTUAL BACKGROUND

22. This action challenges the Secretary's interpretation and application of her enforcement and appeal regulations, and neither the Board's ALJ nor the Board itself purported to make findings of fact about the underlying regulatory citation. However, most of the following facts are likely to be undisputed, and provide context for the legal claims that follow.

23. On April 22, 2010, the Nebraska SSA completed a "survey" at Petitioner's facility, following which the SSA cited a single "deficiency" that alleged "actual harm" to one or more of Petitioner's residents.

24. The cited deficiency alleged that two residents, who were identified with the pseudonyms "Resident #1" (a 92-year old man), and "Resident #2" (a 69-year old woman), both of whom suffered from dementia and lived on Petitioner's "Alzheimer's Disease Unit," had been observed on several occasions during the preceding weeks touching one another in ways that the survey team considered to have "sexual" connotations. (The touching was mostly hand-holding and hugging in the resident lounge, and there is no suggestion that the Residents were disrobing, engaging in sexual activity, or doing anything at all in private.) The citation specifically recited that Petitioner's staff discussed the matter with both Residents' physicians, family members and legal representatives, that none had any objection, and that all instructed Petitioner's staff not to prevent the Residents from being affectionate with each other.

25. The SSA nevertheless concluded that the mere fact that Petitioner's staff allowed two demented residents to touch one another supported a violation of 42 C.F.R. § 483.13(b), which provides that a "resident has the right to be free from verbal, sexual,

physical, and mental abuse, corporal punishment, and involuntary seclusion," and that "the facility must not use verbal, mental, sexual, or physical abuse, corporal punishment, or involuntary seclusion."

26.   After the SSA cited the deficiency, Petitioner sought "informal dispute resolution" ("IDR") from the SSA under state law.  At the IDR proceeding, the SSA reiterated its position that any physical contact at all between cognitively impaired residents (who are not married to one another) ipso facto is a regulatory violation, even if apparently consensual, even if approved by family or legal surrogates, and even if no injury results.  According to the SSA, a nursing facility is in violation of the "abuse" regulation if it tolerates or facilitates such contact.

27.   The SSA upheld the "abuse" citation in a written decision that stated that while other societies (such as "Europe") may tolerate physical contact such as hand holding or walking arm in arm, "in the United States we tend to reserve this physical contact for persons whom we have 'feelings' for."  According to the SSA Decisionmaker, "While I respect the fact that the facility was attempting to be 'caring' and protective of resident's rights, the dementia resident's rights must be forfeited [sic], except in the simplest of choices, because they do not have the proper judgment to make informed decisions."

28.   On May 12, 2010, the Secretary sent a Notice to Petitioner that provided that as a result of the cited deficiency, that is, as it was described by the SSA, she was imposing a denial of payment for new admissions ("DPNA") effective May 27, 2010, and termination of Petitioner's Medicare/Medicaid Provider Agreements effective September 4,

2010, should Petitioner not resume "substantial compliance" with the "abuse" regulation before those dates.

29. The Secretary subsequently informed Petitioner that the SSA had determined that Petitioner resumed "substantial compliance" as of May 30, 2010. Accordingly, the DPNA took effect for three days, and the termination action was cancelled. Petitioner admitted at least one resident during the short period that the DPNA was in effect, so the denial of reimbursement for that admission provided the regulatory basis for an administrative appeal under 42 C.F.R. § 498.3(b)(13), as there was "a finding of noncompliance that resulted in" a sanction.

30. On July 10, 2010, Petitioner filed a timely Request for Hearing pursuant to 42 C.F.R. §§ 498.1 et seq. to contest the finding of noncompliance and the DPNA.

31. On August 13, 2010 Petitioner filed a Motion for Summary Disposition (with supporting documentation), arguing that the SSA's allegations, even if taken as true for purposes of the Motion, did not establish noncompliance with the "abuse" regulation, constitute "actual harm" to any resident, or provide the basis for a sanction.

32. Rather than contesting that Motion or otherwise attempting to support the citation, the Secretary responded by simply changing the effective date of the DPNA to May 30, 2010 – i.e., effectively withdrawing the sanction, as the agency already had found that Petitioner had resumed compliance as of that date – but leaving the underlying citation and finding of "actual harm" in place.

33. The Secretary's Counsel thereupon notified Petitioner's Counsel that the Secretary would file a Motion to Dismiss Petitioner's appeal pursuant to a long line of

Board Decisions allowing CMS to vitiate otherwise proper appeals by withdrawing remedies.

34. According to the Board, the Secretary interprets 42 C.F.R. § 493.13(b)(13) to permit an appeal of a "finding of noncompliance" only if the Secretary enforces the resulting sanction *during the appeal.* The Board does *not* consider the matter "moot" if she withdraws the sanction since, as noted below, the finding of noncompliance itself continues to have collateral regulatory effects; instead, the Board says that the regulation, as it interprets it, requires *both* a finding of noncompliance *and* a *continuing* remedy in order to constitute an appealable "initial determination."

35. Petitioner was unhappy about this result, but recognized that the Secretary's Counsel was correct that the Board had held many times that the Secretary could vitiate even properly filed appeals in that manner. Accordingly, in the interest of efficiency and professional courtesy, Petitioner agreed to dismiss the appeal rather than requiring the Secretary to file a Motion. Petitioner did so on September 9, 2010 (by email), and the ALJ entered a pro forma Order the same day dismissing the appeal, but reciting that Petitioner could file a motion within 60 days thereafter to vacate the dismissal "for good cause" per 42 C.F.R. § 498.72.

36. That would have ended the matter, but on September 17, 2010 – one week *after* the ALJ entered his September 9, 2010 Order -- the Secretary issued a Memorandum that considerably changed the consequences of the SSA's citation of the "abuse" deficiency. In that Memorandum, the Secretary announced new criteria for nominating nursing facilities to her "Special Focus Facility" Program ("SFF Program"). As the

Secretary describes it, the SFF Program is an informal regulatory initiative – that is not described in any regulation or even manual – that she has implemented to identify and sanction facilities that she says have a history of poor surveys, as measured by *the citation of,* among other things, "actual harm" deficiencies such as that at issue here. Each selected facility receives more frequent surveys, enhanced survey scrutiny, and immediate imposition of sanctions for all subsequently cited deficiencies, up to and including expedited termination from the Medicare/Medicaid Programs if the facility does not "graduate" from the SFF Program according to various internal criteria, none of which are set forth in any statute or regulation.

37. Notably, a facility's disagreement with the accuracy or appropriateness of a citation that is the basis for nomination for SFF designation is immaterial to the Secretary. Likewise, her Appeals Board allows no appeals of such designations.

38. The Secretary also has implemented what she calls her "Five Star" "public quality rating program," under which she rates nursing facilities according to, among other factors, "points" assigned to every *cited* deficiency, whether or not a facility contests or even appeals the deficiency. The Secretary publishes such ratings on her public websites, distributes ratings to local media, and has made clear that the point of the ratings is to dissuade consumers and referral sources from patronizing low-rated facilities. Thus, the Secretary's public ratings now state that Petitioner has been cited for "sexual abuse" of its residents. The Secretary does not note on her website that Petitioner appealed the citation, nor permit any explanation, and, again, Board does not permit appeals of such ratings.

39. At the time the Petitioner agreed to withdraw its appeal on September 9, 2010, there seemed to be no pressing reason to pursue the matter further notwithstanding Petitioner's unhappiness with the Secretary's tactics, since Petitioner was not a SFF. However, the Secretary's September 17, 2010 Memorandum required States to create a *new* list of potential candidates for selection as SFFs that increased by *five times* the number of potential SFFs, and thus made it very possible that a single "actual harm" citation such as that at issue here *could* make Petitioner eligible for such status. As noted, whether a facility disputes the accuracy or appropriateness of a citation – or, as here, even has filed an appeal – is *not* a criterion for selection.

40. Accordingly, on October 14, 2010 Petitioner filed a Motion under 42 C.F.R. § 498.72 requesting that the ALJ vacate his Order dismissing Petitioner's Request for Hearing for good cause, and that he set the matter for a hearing on the merits. In its Motion Petitioner discussed in detail the impact of the Secretary's September 17, 2010 Memorandum, and the necessity to remove from the regulatory record the unwarranted allegation of "sexual abuse."

41. On October 20, 2010 the ALJ denied the Motion on the ground that the Board's Decisions interpreting 42 C.F.R. § 498.3(b)(13) foreclose review of the merits of such determinations where, as here, the Secretary purports to withdraw a sanction, even following initiation of an otherwise proper appeal.

42. On November 2, 2010 Petitioner filed a timely Request for Review of that Order with the Board's Appellate Division.

43. On March 2, 2011 the Appellate Division issued its Decision affirming the ALJ's dismissal of the appeal. In its Decision, the Board affirmed its policy that the Secretary may vitiate an otherwise proper administrative appeal simply by rescinding a sanction, while leaving the underlying allegations of noncompliance on the public record, and available for collateral regulatory enforcement actions (and other purposes). This appeal followed.

## VI. STATEMENT OF CLAIMS

### COUNT I -- VIOLATION OF SOCIAL SECURITY ACT AND REGULATIONS

44. Petitioner realleges paragraphs 1 through 43 as if set forth in full.

45. 42 U.S.C. §§ 405(b) and (g), as interpreted and applied by the Supreme Court, require the Secretary to undertake administrative review of all compliance and enforcement determinations with which a provider disagrees.

46. The Secretary's regulations at 42 C.F.R. Part 498 are designed and intended to implement these statutory provisions.

47. The Secretary has no authority to disregard or limit a provider's statutory right of administrative review, or to interpret or apply her regulations in a way that is inconsistent with the statute.

48. The Board's dismissal of Petitioner's appeal without reaching the merits of her "determination of noncompliance" violates the administrative review provisions of the Social Security Act, and the Secretary's regulations, as properly harmonized with the statute.

### COUNT II --VIOLATION OF DUE PROCESS

49. Petitioner realleges paragraphs 1 through 43 as if set forth in full.

50. The Fifth Amendment to the Constitution provides that the Federal Government may not impair any property interest without due process of law.

51. The Supreme Court consistently has held that the Constitutional requirement of due process governs the Secretary's imposition of sanctions and other burdens (as defined from the regulated party's perspective) under the Social Security Act.

52. The Court consistently has held that due process in the Social Security Act context requires, among other things, a meaningful right to be heard, a neutral and detached hearing officer or body, and that the right to appeal must be real and not a sham.

53. The effect of the Board's Decision – that is, that the Secretary's unreasonable allegations of "sexual abuse" and noncompliance remain on the public record, and not subject to review, but nevertheless can and will be used by the Secretary to support collateral enforcement and other actions, and to formulate public "quality ratings" of Petitioner – deprives Petitioner of protected property rights without due process of law.

### COUNT III – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

54. Petitioner realleges paragraphs 1 through 43 as if set forth in full.

55. The Administrative Procedure Act, 5 U.S.C. § 701 et seq., governs the Secretary's operation of the Medicare and Medicaid Programs, including her administrative appeals process.

56. The Board's dismissal of a properly filed administrative appeal was and is arbitrary, capricious and otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(D).

## COUNT IV – ABUSE OF DISCRETION

57. Petitioner realleges paragraphs 1 through 37 as if set forth in full.

58. The standard rule of federal law is that a federal tribunal's jurisdiction depends on the facts as they existed when an appeal is initiated, and cannot be ousted by subsequent events.

59. Even if the Board's interpretation and application of its governing statutes and regulations is otherwise correct, the Board has no authority to rely upon the Secretary's withdrawal of a sanction *after* an appeal is perfected to dismiss an otherwise proper appeal, especially where the underlying finding of noncompliance remains on the public record, and is available to the Secretary for use in subsequent enforcement or other proceedings.

60. The Board abused its discretion by deciding that the facts and circumstances of this case did not constitute good cause to permit Petitioner to proceed in its administrative appeal.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Petitioner prays that this Court:

A. Declare that the Board's Decision dismissing Petitioner's administrative appeal violated the Social Security Act;

B.    Declare that the Board's Decision dismissing Petitioner's administrative appeal deprived Petitioner of a protected interest without due process of law;

C.    Declare that the Board's Decision dismissing Petitioner's administrative appeal was arbitrary, capricious, and not in accordance with law;

D.    Declare that the Board abused its discretion in denying review of the merits of Petitioner's administrative appeal while at the same time allowing the Secretary to retain her findings of "sexual abuse" on the public record for use in collateral proceedings;

E.    Remand this matter to the Board for a determination on the merits of Petitioner's appeal of the Secretary's allegation of "sexual abuse;"

F.    In the alternative, should the Court find that Petitioner has exhausted all possible administrative review procedures before the Board, set this matter for a hearing on the merits of the Secretary's finding of "sexual abuse;"

G.    Award Petitioner its costs of this action, including reasonable attorneys fees; and

H.    Grant such other and further relief as the Court may deem reasonable and just.

Dated this 1st day of April, 2011.

                GOLDEN LIVING CENTER – GRAND
                ISLAND LAKEVIEW, Plaintiff/Petitioner,

                s/Steven D. Davidson
By:  Steven D. Davidson (#18684)
      BAIRD HOLM, LLP
      1700 Farnam Street
      Suite 1500

Omaha, Nebraska 68102-2068
Telephone: (402) 344-0500
Fax: (402) 344-0588
sdavidson@bairdholm.com

and

Joseph L. Bianculli
HEALTH CARE LAWYERS, PLC
2114 N. Pollard Street
Arlington, VA 22207
Telephone: (703) 841-9330
Fax: (703) 841-9334
bianculli@healthcarelawyers.com

ATTORNEYS FOR PLAINTIFF/PETITIONER

DOCS/1028384.2